# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8944 | **DATE** | 3/2/2004 |
| **CASE TITLE** | Wayne Nobles vs. Nalco Chemical Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Nalco Chemical Company's motion for summary judgment (Doc. No. 15-1) is granted. Nalco's motion to strike Nobles' affidavit as untimely (Doc. 35-1) is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR ... 2004 date docketed | |
| | Docketing to mail notices. | | | **35** |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/2/2004 date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | ETV mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

DOCKETED

MAR 3 - 2004

WAYNE NOBLES,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )     No. 01 C 8944
                                       )
NALCO CHEMICAL COMPANY,                )     Judge Rebecca R. Pallmeyer
                                       )
            Defendant.                 )

## MEMORANDUM OPINION AND ORDER

Plaintiff Wayne Nobles ("Nobles") filed this suit against his former employer, Defendant Nalco Chemical Company ("Nalco"), alleging that he was the victim of sex and race discrimination and retaliation in violation of 42 U.S.C. § 2000e *et seq.* Specifically, Nobles, who was the only African-American male working in Nalco's Procurement Department, claims he was subjected to a hostile work environment and was denied training, promotions, transfers, and salary increases because of his race and sex. When he complained to Nalco's Human Resources Department, Nobles alleges, Nalco officials retaliated against him and ultimately terminated his employment in April 2001. Nalco denies that any discrimination or retaliation occurred. Nalco now moves for summary judgment, arguing that the undisputed facts show that Nobles cannot establish a prima facie case of discrimination or retaliation. For the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

### A.    Nobles' Job Duties and Performance Expectations

Nobles is an African-American male. (Defendant's Local Rule 56.1 Statement of Uncontested Material Facts (hereinafter "Def.'s 56.1") ¶ 6.) Although he attended colleges in Mississippi, Kansas, and Wisconsin, Nobles has never earned a college degree. (Employment Application and Personal History Data Form, Exs. 2, 4 to Nobles Dep.; Def.'s 56.1 ¶ 7.) He did,

35

however, receive a certification as a transportation manager from Johnson City College in Kansas. (Nobles Dep., at 73-74.) Nobles also possesses a trade school certificate as a locomotive engineer and has a professional license as a gospel preacher. (*Id.* at 74.)

In October 1999, Nobles received a letter from Rosemary NaTreffa ("NaTreffa") at Nalco, offering him a position as Clerical Specialist in the Procurement Department. (*Id.* at 71-72; Ex. 3 to Nobles Dep.) From the time of his hire on November 1, 1999, until his termination on April 30, 2001, Nobles worked as a Clerical Specialist. In that position, he was responsible for performing complex clerical duties with minimal supervision, which required independent analysis, exercise of judgment, leadership responsibility, and a detailed knowledge of company procedures. (Def.'s 56.1 ¶ 13; Ex. A to Jane Tinker Declaration.)

Until early November 2000, Nobles reported directly to Hadley Hurford ("Hurford"). (*Id.* ¶ 5.) Following a reorganization in November 2000, Jane Tinker ("Tinker") became Nobles' supervisor. (*Id.*) As Purchasing Manager, Tinker was responsible for managing processes in the Procurement Department, as well as supervising administrative staff and some professional level staff in the Department. (*Id.* ¶ 8.)

On or about November 13, 2000, Tinker met with Nobles to discuss Nobles' responsibilities for processing corrective action requests ("CARs"). (*Id.* ¶ 14.) CARs are used by Nalco to notify suppliers about, and correct problems with, quality, quantity, or delivery of goods and services purchased by Nalco. (*Id.*) Nobles was responsible for recording all CARs received by the Procurement Department on a spreadsheet. (*Id.* ¶ 15.) He was also expected to identify the Nalco Purchasing Manager assigned to the good or service in question, follow up with that person to ensure that the problem was resolved, and then make an entry in the spreadsheet to show the CAR matter was closed. Finally, Nobles was required to notify the person who originally requested the correction that the CAR was closed. (*Id.*) Tinker explained to Nobles in the November 13 meeting that she expected the entire CAR process to be completed in thirty days. (*Id.*)

2

Tinker and Nobles met again on December 27, 2000, to further discuss Nobles' job responsibilities. (*Id.* ¶ 18; Nobles Dep., at 163-64.) Tinker was aware that Nobles had not received any salary increase under Hurford's supervision. She stated in her Declaration that she wanted to be certain that Nobles understood his responsibilities and had appropriate training. (*Id.*; Ex. 3 to Def.'s 56.1, Tinker Declaration ¶ 15.) At the December 27 meeting, Tinker gave Nobles a typed list of his job responsibilities, in which she again explained that CARs should be completed within thirty days. (*Id.*; Nobles Dep., at 164; Ex. 19 to Nobles Dep.)

Plaintiff had additional job responsibilities, which included creating and sending purchase orders for products such as office supplies, business cards, and computer equipment. (*Id.* ¶ 19.) Nobles was also responsible for creating and maintaining what the parties refer to as "outline agreements" for the "Portafeed group." Portafeeds are reusable containers that Nalco uses to ship its water treatment products to suppliers. (*Id.* ¶ 20.) Nobles' responsibilities for maintaining the outline agreements required him to update product numbers, prices, and specifications. (*Id.*) Tinker explained these job responsibilities to Nobles during the December 27 meeting. (*Id.* ¶ 18.) She also informed him that she expected to meet with him again in mid-January to discuss transferring some of Nobles' responsibilities to staff inside the Portafeed group. (*Id.* ¶ 21.) Tinker requested that Nobles review certain materials in preparation for that meeting. (*Id.*)

As anticipated, Tinker did meet with Nobles on or about January 17 or 19, 2001 to discuss his job responsibilities and his work relating to the Portafeed group. (*Id.* ¶ 23.) According to Tinker, Nobles was not prepared for the meeting. (*Id.*; Tinker Declaration ¶ 20.) Nobles admits that he was not prepared, but explains this was because he was unsure of the date and time of the meeting due to Tinker's fluctuating schedule. (Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts (hereinafter "Pl.'s 56.1") ¶ 23; Nobles Aff. ¶ 6.) During this meeting, Nobles requested additional training in order to achieve the performance expectations for his position. (Def.'s 56.1 ¶ 24.) Tinker explained to Nobles that he would receive training from Nalco

employee Mary Cepek regarding the necessary computer programs; Tinker further suggested materials for Nobles to review on his own. (*Id.*; Tinker Declaration, Ex. E.) It is unclear from the record whether Nobles did in fact receive the training or review the materials on his own. In his 56.1 Response, Nobles asserts that any training he received was inadequate because it was casual and informal in nature. (Pl.'s 56.1 ¶ 24.) Later in his 56.1 Response, however, Nobles admits that he received all training necessary for him to perform his job duties. (*Id.* ¶ 34.)

## B. Nobles' Probation and Termination

Throughout late 2000 and 2001, Tinker monitored all Procurement Department administrative staff job performance. (Def.'s 56.1 ¶ 26.) Tinker observed that Nobles was not processing CARs or purchase orders as quickly as necessary. She explained in her Declaration, further, that Purchasing Managers and other Nalco personnel requesting CARs and purchase orders complained about Nobles' performance and advised her that they often had to "re-do" Nobles' work. (*Id.*) In his Affidavit, Nobles claims that his performance was as good as other individuals within the department, though he offers no explanation as to how he became aware of his co-workers' performance. (Pl.'s 56.1 ¶ 26; Ex. 3 to Nobles Aff.)[1] In response to these complaints, Tinker conducted an investigation on or about February 12, 2001. (Def.'s 56.1 ¶ 27.) She discovered that Nobles had not made any new entries on the spreadsheet or closed any CARs since November 28, 2000. Nobles' performance in this respect was unacceptable in Tinker's opinion. (*Id.*) In his Affidavit, Nobles claims that any deficiencies in his work were caused by staffing shortages and shifting duties and priorities. (Pl.'s 56.1 ¶ 27; Nobles Aff. ¶ 5.)[2] He explains

---

[1]     Exhibit 3 to Nobles' Affidavit, a graph purporting to represent Nobles' and his co-workers' job performance, is unenlightening. The graph, for which Nobles has offered no evidentiary foundation, at best provides merely an approximate number of purchase orders, and an approximate total value, for each member of the purchasing group staff. There is no indication of the time period in which the data was collected, nor any information that could rebut Nalco's assertion that some quantity of Nobles' work had to be redone by others.

[2]     Exhibit 5 to Plaintiff's Rule 56.1 submissions consists of a summary chart that
(continued...)

4

that the department was short staffed because of absences and unfilled positions. (Nobles Aff. ¶ 5.) He acknowledges that Tinker offered him the assistance of temporary employees, but explains that he thought they would not be useful because they would have to be trained. (Id.)

Tinker reviewed Nobles' performance problems with her superiors, who authorized her to terminate Nobles' employment in February 2001. Tinker decided instead, however, to place him on probation to give him a chance to improve his performance. (Def.'s 56.1 ¶ 28.) Tinker informed Nobles of his probationary status on February 13, 2001, and explained that it was due to his failure to fulfill his job responsibilities with respect to the CARs. (Id. ¶ 29.) In this meeting, Nobles admitted that he had not updated any CARs since November and had declined Tinker's offer of assistance from temporary employees. (Id.) Tinker followed up with a memo confirming that Nobles was on probation and that his failure to process CARs within the guidelines could result in termination. (Id. ¶ 31; Ex. G to Tinker Declaration.) Nobles responded to Tinker's memo with a memo of his own, explaining that he had not entered any new CARs in the previous six weeks because the department was shorthanded and because processing CARs was only a small part of his daily responsibilities. (Id. ¶ 32; Ex. H to Tinker Declaration.) Within a day or so after that, Nobles began an extended sick leave; he was absent from February 19, 2001, through March 15, 2001. (Id. ¶¶ 32, 35.)[3] Nobles testified that as of February 19, 2001, there were at least six CARs that had come in during 2001 that had not been completed. (Id. ¶ 33; Nobles Dep., at 387.)

_____

[2](...continued)
purportedly demonstrates that Nobles' performance was similar to that of his co-workers. Nobles again provides no foundation for admission of this chart. Even assuming it was prepared by someone with first-hand knowledge, without a more complete explanation, the court is unable to draw any conclusions from Exhibit 5. For example, the initials that appear in the column marked "Buyer" appear to identify Mr. Nobles' co-workers. Other pages of the chart identify those co-workers not by initials but by their first names. Because no record of Mr. Nobles' own performance appears in any of the pages he has submitted, however, the court is unable to draw any conclusions concerning how his performance compares with that of his colleagues.

[3]     Neither side has explained the nature of Nobles' illness.

5

On or about January 27, 2001, Tinker began her performance review process for the administrative staff by sending each staff member a blank performance review form, a portion of which was to be completed by the employee. (*Id.* ¶ 25.) This was the first such formal performance review anyone in the Procurement Department administrative staff had received since August 2000 and the first review Nobles had received since he began working for Nalco in November 1999. (*Id.*; Tinker Declaration ¶ 22.) Nobles had not completed the form before going on sick leave, so when he returned to work on March 16, 2001, Tinker asked him to return the completed portion of the performance review form to her by March 21, 2001. (*Id.* ¶ 36.) On March 20, 2001, Nobles gave Tinker a letter discussing his job performance, but did not return the completed portion of the performance review form. (*Id.* ¶ 37; Tinker Declaration ¶ 31; Ex. I to Tinker Declaration.)

Tinker met with Nobles on or about March 29, 2001 to discuss his performance review. Due to his problems processing CARs and purchase orders, Tinker rated Nobles as needing improvement in the categories of job skills, quality of work, teamwork, and attitude. (*Id.* ¶ 38.) Tinker discussed with him specific problems mentioned in the review, as well as his failure to follow procedure with CARs and the effects his poor performance could have on the Procurement Department's objectives. (*Id.*) Nobles refused to sign his performance review. (*Id.* ¶ 39.)

Throughout the latter part of March and April 2001, Tinker says she continued to monitor Nobles' performance. (*Id.* ¶ 40; Tinker Declaration ¶ 34.) She observed that "Mr. Nobles continuously failed to process CARs in accordance with the guidelines we had discussed and continued to fail to fulfill his job responsibilities in other respects." (Tinker Declaration ¶ 34.) Nobles denies this; he asserts that Tinker did not properly monitor his performance and that he did satisfactorily perform his job responsibilities, though he offers no explanation as to how Tinker's monitoring of him was deficient. (Pl.'s 56.1 ¶ 40.) In April 2001, Tinker recommended to her supervisor, John Williams ("Williams"), that Nobles' employment with Nalco be terminated. (Def.'s

56.1 ¶ 40.) On April 30, 2001, Williams and Tinker met with Nobles to inform him that he was being discharged. (Id. ¶ 41.)

Tinker was unaware that Nobles thought he was being discriminated against or harassed during his employment on the basis of his race or sex. (Id. ¶ 43.) She first learned of Nobles' allegations of race and sex discrimination and harassment after Nobles' termination from employment. (Id.) Nobles believes Tinker was aware of his discrimination complaints, but he has offered no evidence in support of his belief and admits he did not present a complaint about the matter to Tinker directly. (Pl.'s 56.1 ¶ 43.)

## C.   Other Employees' Performance Problems and Termination

In the course of monitoring the performance of the Procurement Department administrative staff, Tinker also observed performance problems with a Caucasian female Clerical Specialist, Teinya Prusinski ("Prusinski"). (Def.'s 56.1 ¶ 80.) Prusinski began reporting directly to Tinker beginning in early November 2000 through the time of her termination on March 16, 2001. (Id.) Tinker noticed in late January and early February 2001 that Prusinski failed to process invoices and purchase orders and failed to fulfill her job responsibilities in other respects. (Id. ¶ 82.) In February 2001, Tinker recommended to her supervisor that Prusinski be terminated based on her inadequate job performance, despite the fact that Prusinski had been absent from work on sick leave for most of February. (Id.) On or about March 1, 2001, Tinker informed Prusinski that her employment with Nalco was being terminated. (Id. ¶ 83.)

## D.   Nobles' Allegations of Employment Discrimination and Harassment

Nobles alleges harassment based on various encounters with co-workers at Nalco. (Id. ¶¶ 44-62.) In his testimony detailing the alleged harassment, Nobles describes one white female co-worker's use of the "f___" word and her statement on another occasion that she "liked black men." (Id. ¶ 45; Nobles Dep., at 116.) Nobles did not explain how this comment is offensive and

7

acknowledged that he does not think there is anything wrong with Caucasian women liking African-American men. (*Id.*; Nobles Dep., at 116-17.) Nobles also recalls several conversations to which he was not a party, in which women made negative comments about men. (*Id.* ¶¶ 46-48.) In one such conversation in November or December 2000, Nobles overheard a female co-worker telling Tinker at her cubicle that men were "only good for one thing, and that's servicing," to which Tinker responded by saying "they're not even good for that." (*Id.* ¶ 48.) On another occasion in February 2001, Tinker inquired about a necktie Nobles was wearing; Nobles told Tinker it was made of Kente cloth from Africa and, according to Nobles, Tinker asked him not to wear it anymore. (*Id.* ¶ 49.)

Nobles also received several e-mails, documents, and cartoons during his employment that he found offensive. (*Id.* ¶ 50; Exs. 48-58 to Nobles Dep.) Although Nobles submitted copies of these documents as part of his deposition, he never gave any of these documents to Tinker or brought them to her attention. (*Id.*) One such document, received before November 2000, was entitled "Expressions for High Stress Days" and included such quips as "Mommie, when I grow up I want to be a neurotic bitch just like you." (*Id.* ¶ 51.) Another, which Nobles received in the latter part of the year 2000, was entitled "Dumb Men Jokes." (*Id.* ¶ 52.) Nobles testified that he received this item from "the ladies in the department." He understood the jokes as aimed at him or at the other men in the Procurement Department and kept the document on his credenza. (*Id.*) Another document which contained religious precepts used the word "covetousness," a reference, in Nobles' view, to race or sex. At some point, Nobles received a printed out e-mail with the subject line "Say goodbye 2 our brutha [sic], he will be missed!!!" which depicted former President Clinton as an African-American. (*Id.* ¶ 59.) Nobles found this document to be offensive. (*Id.*)

Nobles received two other e-mail images "from the ladies in the department," one referred to as "pookey-poo" and one depicting a man dancing nude on a pole. (*Id.* ¶ 62.) The e-mail entitled "pookey-poo," Nobles explained, "depict[ed] an African-American, somewhat illiterate, on the Regis show, and it was foolishness." (*Id.*) Another printed document contained a joke about

a married man who, on learning about a dog that had killed its owner's wife and mother-in-law, asked to borrow the dog. (*Id.* ¶ 54.) An e-mail from another co-worker included a joke in which an old man refers to his wife as Satan's sister. (*Id.* ¶ 60). It makes no inference to race. Yet another document Nobles received was entitled "To smart women everywhere!" and included statements such as, "I'm not offended by dumb blond jokes because I know I'm not dumb . . . and I also know I'm not blonde" and "I've been on so many blind dates, I should get a free dog." (*Id.* ¶ 57.)

## E.    Nobles' Applications for Other Positions at Nalco

In late March 2001, James Nardone ("Nardone"), a Manager in Nalco's Transportation Department, posted an opening for a position as Logistics Specialist at Nalco for bid through Nalco's Self-Nomination Program. (*Id.* ¶ 64.)[4] The position required a Bachelor's degree. (*Id.*) Nobles submitted a self-nomination bid for the position. (*Id.* ¶ 65.) After reviewing the application, interviewing Nobles, and talking with Nobles' former supervisor, Hurford, Nardone offered the position to another candidate, a Caucasian male employee who has Bachelor's and Master's of Science degrees and significantly greater experience within Nalco. (*Id.* ¶ 67.) Nardone explained that his decision not to offer Nobles any positions in the Transportation Department was based on Nobles' performance and his failure to meet the minimum requirements for the Logistic Specialist position (i.e., a Bachelor's degree). (*Id.* ¶ 66.)

Although he recalls speaking with Nobles about employment in the Transportation Department several months before the Logistics Specialist position was available, Nardone is unaware of Nobles' submitting any other application for employment in that Department. (*Id.* ¶¶

---

4    Nalco policy requires any employee seeking a transfer to a different position to complete a self-nomination application for the position sought. (Def.'s 56.1 ¶ 85.) Nobles contends that the Nalco policy regarding employee transfer was a much more flexible and informal process, but he offers no evidence or examples other than his meetings with Richard Malak described below. (Pl.'s 56.1 ¶ 85.)

68, 70.) Nobles contends, however, that some time prior to his termination, he interviewed with Richard Malak ("Malak") in the Transportation Department concerning two job openings, and submitted a self-nomination form to Rosemary NaTreffa. (Nobles Aff. ¶ 16.) According to Nobles, Malak in fact offered him a position related to transportation of tank cars either off site or at the Nalco location, conditioned on his acquiring a release from the Procurement Department. (Id.) Nobles believes that Tinker refused to release him and instead terminated him, but he offers no evidence in support of this claim; neither Tinker herself nor anyone else confirmed Nobles' suspicions. (Id.) To the contrary, Nalco contends that Nobles never submitted a self-nomination application for any position for which Malak had hiring responsibility and that Malak never formally interviewed Nobles for any position. (Def.'s 56.1 ¶ 74.) Malak does recall that he had a discussion with Nobles at Malak's cubicle concerning positions available in the Logistics Department, and that Nobles sent Malak his resume via e-mail, but Malak denies interviewing Nobles for any open position. (Id. ¶ 73; Malak Declaration ¶ 35.)

During the course of his employment with Nalco, Nobles also had discussions with Hurford in May 2000 regarding the position of "Procurement Coordinator" or "Junior Buyer." (Id. ¶ 77.) Nobles understood that this position was created in May 2000 and that Hurford initially appointed him to fill the position and begin working with vendors. (Id.) Nobles acknowledges, however, that he received no confirmation of the appointment, no job description, and no salary information. (Id.) In the first week of June 2000, Hurford told Nobles that he would not be getting the "Procurement Coordinator" position because of changes in the department. (Def.'s 56.1 ¶ 79.) To Nobles' knowledge, no one ever became the "Procurement Coordinator" or "Junior Buyer," nor is Nobles aware who made the decision not to create the position or why the decision was made. (Id.)

## F.    Nobles' Conversations with Nalco's EEO and Human Resources Departments

Nobles had conversations with several individuals in Nalco's EEO and Human Resources Departments. (Id. ¶ 84.) He discussed other job opportunities, possible resignation, his

performance problems, why he was being "harassed" and "hassled" about work procedures, his performance review, one offensive e-mail he received (which he forwarded to the Human Resources Department in December 2000 or January 2001), and his medical leave. (*Id.*) Nobles admits that he did not complain about race discrimination or sex discrimination in any of these conversations. Nobles asserts, however, that he did advise June Maltsev in Nalco's EEO Department of his discriminatory treatment within the Procurement Department. (*Id.*; Pl.'s 56.1 ¶ 84.) He also alleges that he told Brian Corrigan, a Nalco Human Resources employee, that he made an internal EEO complaint in November or December 2000. (Pl.'s 56.1 ¶ 84.)

## G.    Nalco's Employment Policies and Compliance with Title VII

Nalco's policies are disseminated to all employees when they start work at Nalco. (Def.'s 56.1 ¶ 89.) Nalco provides its employees with periodic updates on its employment practices and procedures, and posts information regarding employee rights pertaining to discrimination and harassment on bulletin boards visible throughout the facility. (*Id.*) Nalco provides management employees with periodic formalized training sessions on EEO issues, including harassment and discrimination in the workplace, and provides training regarding these subjects to all employees at new-hire orientation. Tinker received both types of training. (*Id.*)

Nalco characterizes itself as an equal opportunity employer. (*Id.* ¶ 86.) When Nobles was hired, he received a copy of Nalco's harassment, affirmative action, and EEO policies, and the Nalco policy regarding salaries. (*Id.*) Under the salary policy, salaries and pay increases are determined by merit and work performance, as well as the employee's current level within the salary range assigned to the position. (*Id.* ¶ 88.) Nalco's anti-harassment policy states:

> It has always been the policy of Ondeo Nalco Company that all of our employees should be able to enjoy a work environment free from all forms of discrimination, including sexual harassment. . . . No employee – either male or female – should be subjected to unsolicited and unwelcome sexual overtures or conduct. . . . Any questions regarding this policy or a complaint of a specific fact situation should be

11

addressed to Jackie Bonin, Manager, Employee Services. . . . Complaints will be investigated and appropriate steps taken . . . .

(*Id.* ¶ 87.) Nobles admits that he understood he was expected to contact Nalco's Human Resources Department if he wished to voice a complaint. (*Id.*; Pl.'s 56.1 ¶ 87.)

## H.    Nobles' EEOC Charge

Nobles claims that Nalco discriminated against him on the basis of his race and sex by denying him salary increases, training, and promotions, and by terminating him and retaliating against him. (*Id.* ¶ 90; EEOC Charge.) In his EEOC charge, filed on June 6, 2001, he checked boxes for discrimination based on "race" and "sex," but not "retaliation." (*Id.*) Nobles alleged in his EEOC charge that the discrimination took place beginning when he was hired on November 1, 1999 through his termination on April 30, 2001 and was a "continuing action." (*Id.*)

## DISCUSSION

Plaintiff claims that he was the victim of: (1) race and sex discrimination, (2) retaliation for his EEOC activity and complaints to his employer's EEO Department, and (3) a hostile work environment. Defendant moves for summary judgment on each of Plaintiff's claims.

## A.    Summary Judgment Standard

A motion for summary judgment will be granted only if no genuine issue as to any material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002). The court must consider the evidence and draw all reasonable inferences in favor of the nonmoving party. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Employment discrimination cases are fact-sensitive, but the court is not required to "scour the record" in an attempt to assist the plaintiff in avoiding summary judgment. *Greer v. Board of Educ. of City of Chicago*, 267 F.3d

723, 727 (7th Cir. 2001). When issues of motive and intent are involved, summary judgment may be appropriate if the plaintiff fails to present evidence demonstrating the alleged motive of intent to discriminate. *See Alexander v. Wisconsin Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001).

## B. Race and Sex Discrimination Under Title VII

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). In this case, Nobles bears the burden of establishing that Nalco discriminated against him. He may satisfy this burden in one of two ways. First, he may proceed under the direct method of proof, by presenting direct or circumstantial evidence that Nalco's actions were based on his race or sex. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (citing *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). Alternatively, he can meet his burden under the direct method rubric by constructing a "convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination. *Id.* (quoting *Rogers*, 320 F.3d at 753 and citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Second, Nobles can defeat summary judgment through the familiar indirect, or *McDonnell Douglas* method of proof. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under either method, summary judgment is inappropriate if Nobles offers evidence from which an inference of discrimination can be drawn. *Fuka v. Thompson Consumer Electronics*, 82 F.3d 1397, 1402-03 (7th Cir. 1996). Nobles offers no direct evidence of discrimination, nor has he identified a "convincing mosaic" which supports such a claim. Accordingly, this court will proceed using the burden-shifting analysis.

13

## 1.   Termination of Employment Claim

In order to establish a prima facie case of employment discrimination under Title VII, a plaintiff must demonstrate that: (1) he belongs to a protected class; (2) he performed his job satisfactorily and met his employer's legitimate expectations; (3) he suffered adverse employment action; and (4) his employer treated similarly situated employees outside of his protected class more favorably. *Contreras v. Suncast Corp.*, 237 F.3d 756, 759 (7th Cir. 2001). If a plaintiff is able to make a prima facie showing, the employer must offer a legitimate nondiscriminatory reason for the employment action. *See McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the plaintiff can prevail if he establishes that the reason offered by the employer is merely a pretext for discrimination. *Cerutti*, 349 F.3d at 1061.

Plaintiff fails to make a prima facie showing of discrimination. As Nalco noted, it is undisputed that Nobles did not meet its legitimate expectations because, as Nobles admits, he repeatedly failed to process CARs in a timely manner, as was required by company policy. Tinker asserted that Purchasing Managers and other Nalco staff often had to "re-do" Nobles' work because it was not satisfactory. Nobles himself admits that as of February 12, 2001, he had not updated the CAR spreadsheet or closed any CARs since November 28, 2000, despite his knowledge of the requirement that all CARs be closed within thirty days. Specifically, it is undisputed that as of February 12, 2001 there were at least six CARs that were outstanding which had exceeded the thirty-day time limit. In addition, Nobles was not processing purchase orders as quickly as necessary. Nobles was repeatedly warned about his performance expectations and the consequences of not meeting the job requirements. His failure to show that he was meeting Nalco's legitimate expectations supplies Nalco with a legitimate, non-discriminatory basis for discharging him.

Moreover, Nobles has not presented any basis for concluding that Nalco treated similarly situated employees outside of his protected class more favorably. The record contains evidence concerning only one other employee in the Procurement Department who was consistently not meeting performance expectations, Teinya Prusinski, a Caucasian female. Prusinski was discharged.[5]

## 2.    Failure to Promote or Transfer Claim

To present a prima facie showing of discrimination in his claim of failure to promote or transfer, Nobles must show that (1) he belongs to a protected class; (2) he applied for and was qualified for the position sought; (3) he was rejected for that position; and (4) Nalco granted the promotion to someone outside of the protected group who was not better qualified than Nobles. See, e.g., Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003); Johnson v. Nordstrom, Inc., 260 F.3d 727, 732 (7th Cir. 2001). Plaintiff has not made such a showing here. Nobles applied for the position of Logistics Specialist, but he was not qualified for that position, which required an undergraduate degree. The person chosen for that position, a Caucasian male, possessed both a Bachelor's and a Master's degree and had many more years of experience at Nalco.

Nobles asserts that he also applied for positions in the Transportation Department and was denied the transfer. Nardone, who made the hiring decisions, never received a completed self-nomination form from Nobles regarding those positions, however. Nobles asserts that he did submit a self-nomination form through Rosemary NaTreffa, but he offers no evidence to support this assertion. The court presumes that if such forms existed, Nobles could have obtained copies of them in discovery or from his own records. Even assuming that Nobles' submission of a resume to Nardone constitutes an application for the positions, Nobles claim still fails because he has

---

[5]     Arguably, Nobles received better treatment in his termination than Prusinski because Nobles was first put on probation and given the chance to improve his work performance.

offered no evidence that any non-African-American males were selected for any positions in the Transportation Department. As for the "Procurement Specialist" or "Junior Buyer" position, Nalco simply determined that such a position would not be created.[6] Therefore, no one outside Plaintiff's protected class was promoted to the position. Plaintiff has not established a prima facie case of failure to promote, and the court will grant summary judgment in favor of Nalco on this issue, as well.

### 3. Denial of Salary Increase Claim

To establish a prima facie case of sex and/or race discrimination under Title VII with respect to salary increases, a plaintiff must show that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated a similarly situated employee who was not a member of the protected class more favorably. *See Cullen v. Indiana Univ. Bd. of Trustees*, 338 F.3d 693, 703 (7th Cir. 2003); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742-43 (7th Cir. 1999). If the plaintiff establishes a prima facie Title VII case based on unequal pay, the burden shifts to the employer to provide legitimate reasons for the disparity. *See Cullen*, 338 F.3d at 703; *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995). As discussed earlier, if the plaintiff fails to establish a prima facie case or fails to show pretext, summary judgment will be granted. *Johnson*, 70 F.3d at 478.

For the reasons explained earlier, Nobles has failed to present a prima facie case of discrimination because he was not meeting Nalco's legitimate expectations. As Nobles recognizes, pursuant to Nalco policy, salary increases are based on employee performance. Nobles was not processing the CARs in a timely manner and was not satisfying other job responsibilities. Nobles

---

[6]     Nalco points out that Nobles' claims relating to the Junior Buyer position arose, if at all, in May 2000, and are therefore time-barred. (Defendant's Memorandum of Law in Support of its Motion for Summary Judgment, at 11.) As noted in the text, this claim fails on its merits in any event.

offers no evidence that any other employee who was also not meeting performance expectations received a salary increase. Indeed, he offers no evidence regarding pay increases awarded to any other Nalco employee. Defendant's motion for summary judgment on this claim is granted.

### 4. Failure-to-Train Claim

In a failure-to-train claim, the plaintiff must demonstrate that: (1) he is a member of a protected group; (2) the employer provided training to its employees; (3) he was eligible for training; and (4) he was denied training given to other similarly situated employees who were not members of the protected group. *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000); *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998). Nobles has not made such a showing. He offers no evidence that he was denied training given to other similarly situated workers. When Nobles asked Tinker for additional training, she suggested materials for him to read on his own. Indeed, Nobles has presented no evidence that other employees were given more training than he was, and he admits that he received all training necessary for him to perform his job duties. Summary judgment is granted on the failure-to-train claim.

### C. Retaliation Claim

The prima facie case for a retaliation claim requires a plaintiff to show that "(1) after lodging a complaint about discrimination, (2) only he, and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) he was performing his job in a satisfactory manner." *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 642 (7th Cir. 2002). *See also Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). To establish a prima facie case of retaliation, an employee need not present proof of a "'causal link' between the protected expression in which the plaintiff engaged (as by filing a complaint about an unlawful act by his employer) and the adverse employment action of which he

is complaining." *Stone*, 281 F.3d at 642. *See also Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir. 2003).

Nobles completely fails to establish a prima facie showing of retaliation. Nobles filed a claim with the EEOC concerning race and sex discrimination, but no employee of Nalco was aware of this complaint until *after* Nobles was terminated. Nobles did have several conversations with Nalco's EEO and/or Human Resources staff regarding his performance problems, his claim of "harassment" about work procedures, and one offensive e-mail he received. Assuming these conversations may fairly be characterized as complaints of discrimination, Nobles' claim fails because he offers no evidence that he was subjected to adverse employment action as compared with any similarly situated employee. Like Nobles, Teinya Prusinski was terminated for failing to meet performance expectations. Nobles admits that he was not processing the CARs within the thirty days, a legitimate job requirement. Because Nobles cannot show that he, and only he, was subjected to adverse employment action despite a satisfactory job performance, summary judgment is granted in favor of the Defendant on the retaliation claim.

## D.    Harassing Work Environment Claim

Nobles argues that Nalco subjected him to racial and/or sexual harassment by exposing him to race and/or sex based e-mails, documents, cartoons, and comments. To maintain an actionable claim under this theory, Nobles must show that his co-workers or supervisors harassed him because of his race and/or sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Hilt-Dyson*, 282 F.3d at 462. Furthermore, this harassment must be sufficiently severe or pervasive so as to alter Nobles' employment and create an abusive working environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). A hostile work environment is one that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact

18

did perceive to be so." *Faragher*, 524 U.S. at 787. *See also Hostetler*, 218 F.3d at 807. In determining whether conduct creates an objectively hostile work environment, courts must consider all of the circumstances, including factors such as: the frequency of the discriminatory conduct, the severity of the conduct, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Faragher*, 524 U.S. at 787-88; *Hilt-Dyson*, 282 F.3d at 463. Title VII does not prohibit all verbal or physical harassment in the workplace. *See Oncale*, 523 U.S. at 81; *Hilt-Dyson*, 282 F.3d at 463. The Seventh Circuit has specifically noted that isolated and minor incidents of questionable conduct will not generally warrant a conclusion of harassment. *See Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 708 (7th Cir. 1995).

The court notes, first, that it is not entirely clear that Nobles subjectively considered his work environment to be hostile and abusive. Apart from forwarding one e-mail to the Human Resources Department, he did not complain to the Human Resources Department about most of the e-mails, documents, and comments. Nor did Nobles voice his concerns to his supervisor at any time.

Even if Nobles can demonstrate that he subjectively believed that his work environment was hostile, such a belief was not reasonable in these circumstances. The e-mails and documents Nobles complains of, however inappropriate, were for the most part not directed at men or at African-Americans. In fact, several of the documents at issue appear to be derogatory towards women. The few e-mails and documents that paint men and/or African-Americans in a negative light are not sufficiently severe or pervasive so as to create a hostile work environment. The comments, e-mails, and documents at issue here are clearly no more severe and pervasive than conduct which has been determined, as a matter of law, not sufficient to support a harassment claim. *See, e.g., Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (isolated, indirect incidents of racial harassment, such as use of the word "nigger" in plaintiff's presence held not severe and pervasive enough to alter conditions of employment); *Adusumilli v.*

19

*City of Chicago*, 164 F.3d 353, 361-63 (7th Cir. 1998) (no actionable harassment where plaintiff complained of conduct which included staring at her breasts and touching her arm and buttocks); *Rogers*, 320 F.3d at 753 (ten offensive comments, only four of which were sexual in nature, over several months insufficient to make police officer's work environment objectively offensive). Because the conduct which Nobles complains of is not sufficiently severe or pervasive to support a harassment claim, summary judgment is granted in favor of the Defendant on the hostile work environment claim.

## CONCLUSION

Nobles has not presented sufficient evidence of a prima facie case of employment discrimination, retaliation, or a hostile work environment based on his race and/or sex. Therefore, for the reasons stated above, Nalco Chemical Company's Motion for Summary Judgment (Doc. No. 15-1) is granted. Nalco's motion to strike Nobles' affidavit as untimely (Doc. No. 34-1) is denied as moot.

ENTER:

Dated:     March 2, 2004

REBECCA R. PALLMEYER
United States District Judge

20